**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOME TODOROVSKI and VIOLETA TODOROVSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>DISCOVERY, INC., WARNER BROS. DISCOVERY, INC., DAVID ZASLAV, and GUNNAR WIEDENFELS,<br><br>      Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Tome Todorovski and Violeta Todorovski ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned counsel, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including review and analysis of: (a) United States ("U.S.") Securities and Exchange Commission ("SEC") filings; and (b) press releases, analyst reports, public statements, conference call transcripts, news articles, and other publications disseminated by or concerning Discovery, Inc. ("Discovery") or Warner Bros. Discovery, Inc. ("WBD").

## NATURE OF THE ACTION

1.   This is a federal securities class action on behalf of all persons or entities who: (1) exchanged Discovery common stock for WBD common stock pursuant or traceable to Discovery's February 4, 2022 Registration Statement on Form S-4 (the "Registration Statement") and Joint Proxy Statement/Prospectus filed with the SEC on February 10, 2022 (the "Prospectus"); (2)

acquired WBD common stock pursuant or traceable to the Registration Statement and Prospectus, including shareholders of AT&T Inc. ("AT&T") and/or Magallanes, Inc, a Delaware corporation ("Spinco") who acquired WBD common stock as a result of the merger (the "Merger") between Discovery and Spinco; or (3) purchased shares of WBD common stock on the open market traceable to the Prospectus through the date of the filing of this Complaint (the "Section 11 Class").

2.      This class action is also brought on behalf of a subset of the Section 11 Class consisting solely of former Discovery shareholders who exchanged Discovery common shares for WBD common shares pursuant to the Prospectus (the "Section 12(a)(2) Subclass").

3.      Excluded from the Class are the Defendants herein, the officers and directors of Discovery or WBD, from May 17, 2021 to the present (the "Excluded D&Os"), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

4.      This action relates to the Merger between Discovery and Spinco, a wholly owned subsidiary of AT&T organized specifically for the purpose of effecting the separation of the WarnerMedia business from AT&T.  The Merger was announced on May 17, 2021 and closed on April 8, 2022.

5.      Prior to the Merger, AT&T transferred its WarnerMedia business to Spinco.  In exchange therefor, as contemplated by and required of the Merger, AT&T distributed all of the issued and outstanding shares of Spinco common stock to AT&T stockholders on a *pro rata* basis.

6.      Pursuant to the Merger, Discovery combined its business with Spinco (including the WarnerMedia business that Spinco had acquired from AT&T) to form WBD.  Each Discovery common shareholder received in the Merger one share of WBD common stock for each Discovery common share owned, and each Discovery preferred shareholder received shares of WBD common

stock in an agreed ratio. AT&T received directly from WBD the balance of the outstanding and issued WBD common shares and contemporaneously distributed those shares to AT&T's shareholders. Specifically, as a result of the Merger, the shares of Spinco common stock that AT&T stockholders received (in consideration for the separation of the WarnerMedia business from AT&T) were automatically converted into the right to receive shares of WBD common stock registered pursuant to the Registration Statement. Each AT&T shareholder received .241917 shares of WBD for each AT&T share owned.

7.      As a result of the Merger, former Discovery shareholders owned 29% of the equity of WBD, and AT&T's shareholders owned 71% of the equity of WBD.

8.      In addition to the exchange of businesses and shares, pursuant to the Merger, Discovery paid AT&T additional consideration in the form of $40.4 billion in cash and separately the retention of certain WarnerMedia debt.

9.      The Merger was subject to a March 11, 2022 majority vote of Discovery voting shareholders of record as of January 18, 2022, but was not subject to a vote of AT&T shareholders.

10.     After the Merger, WBD, as the successor corporation, was managed by Discovery's former senior officers—principally David Zaslav ("Zaslav") as Chief Executive Officer ("CEO") and Gunnar Wiedenfels ("Wiedenfels") as Chief Financial Officer ("CFO") (collectively, the "Individual Defendants").

11.     In all, over 700 million WBD shares were issued to Discovery common and preferred shareholders pursuant to the Merger.

12.     At the time of filing the Registration Statement and Prospectus, Discovery and the Individual Defendants either knew or had access to adverse information concerning operations of the WarnerMedia business.

13.    However, that adverse information was not disclosed to Discovery or AT&T shareholders in the Registration Statement or Prospectus or at any time before the vote on the Merger or the effective date of the Merger.  As a result, the Registration Statement and Prospectus and certain of the Defendants' other public statements contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act").

14.    This adverse information was known or knowable to Discovery and the Individual Defendants prior to the March 11, 2022 shareholder vote, as they would have, or at a minimum should have, been part of due diligence for the Merger.  For example, Defendants acknowledged after the Merger that: (i) WarnerMedia's HBO Max streaming business had a high churn rate that made the business not "viable" unless the churn rate was reversed; (ii) AT&T was overinvesting in WarnerMedia entertainment content for streaming, without sufficient concern for return on investments; (iii) WarnerMedia had a business model to grow the number of subscribers to its streaming service without regard to cost or profitability; (iv) WarnerMedia was improvidently concentrating its investments in streaming and ignoring its other business lines; and (v) WarnerMedia had overstated the number of subscribers to HBO Max by as many as 10 million subscribers, by including as subscribers AT&T customers who had received bundled access to HBO Max, but had not signed onto the service.  Each of these facts were known or knowable with the exercise of reasonable care at the time of the filing of the Registration Statement and Prospectus, the shareholder vote, and the Merger.

15.    Discovery and the Individual Defendants misrepresented and omitted from the Registration Statement and Prospectus the foregoing material facts.  Among other things, the Registration Statement and Prospectus for the Merger represented that:

The combination of Discovery and the WarnerMedia Business *will* create a viable competitor to the largest streaming services by combining the strong, complementary intellectual property portfolios, deep content offerings and high-quality content-creation capabilities of both companies. Following the Transactions, WBD and its streaming products, HBO Max and discovery+, *will* have diverse, high-quality content valued by consumers and a global reach with established presence and brand appeal in key markets. Discovery expects WBD to be better able to compete globally in the fast-growing DTC landscape against the global streaming leaders, including Netflix, Amazon Prime Video and Disney+.

(Emphases added.)

16.     These statements were materially incomplete and untrue and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

17.     From April 11, 2022, the first trading day after completion of the Merger, to September 23, 2022, WBD's market price fell by 52.4%, from $24.78 to $11.79 per share, as the market became aware of the foregoing misrepresented and omitted facts.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

19.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), which vests concurrent jurisdiction for claims under the Securities Act in federal and state courts, and under federal question jurisdiction (28 U.S.C. § 1331) because this action arises under the laws of the U.S.

20.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) because WBD's principal place of business is within this District, WBD transacts business in this District, and a substantial part of the acts and conduct complained of herein occurred in this District.

21.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, the Internet, and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiffs, as set forth in the attached Certification, acquired WBD common stock pursuant or traceable to the Registration Statement and Prospectus as a result of the Merger as shareholders of AT&T stock and/or the common stock of Spinco, and purchased shares of WBD common stock on the open market traceable to the Prospectus through the date of the filing of this Complaint.

23.     Defendant WBD is a global media and entertainment company that creates and distributes a portfolio of content and brands across television, film, and streaming.  WBD's common shares trade on the NASDAQ under the symbol "WBD."  WBD is incorporated in the State of Delaware and has its principal place of business in New York, New York.

24.     Defendant Zaslav served as Discovery's CEO and President from 2007 until the effective date of the Merger.  He was a member of Discovery's Board of Directors from September 2008 until the effective date of the Merger.  From the effective date of the Merger to the date of the filing of this Complaint, Zaslav has served as WBD's CEO and President, and as a member of the WBD Board.

25.     Defendant Wiedenfels served as Discovery's CFO from March 31, 2017 until the effective date of the Merger, and has served as WBD's CFO from the effective date of the Merger to the date of the filing of this Complaint.

26.     Defendants Zaslav and Wiedenfels each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.

27.    Defendants Zaslav and Wiedenfels are herein collectively referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.    Prior to the Merger, WarnerMedia was organized by AT&T as a global media and entertainment business.  WarnerMedia develops, produces, and acquires feature films, television, gaming, and other content for monetization in various media outlets including theatrically, its own and third-party basic and premium Pay-TV, free-to-air television, direct-to-consumer services, live events, and physical/digital retail.  In 2020, WarnerMedia generated $28.1 billion of revenue globally.  That revenue consisted in substantial part of subscription revenue ($10.8 billion), advertising revenue ($3.9 billion), content sales ($9.3 billion), and related party revenue ($3.4 billion).

29.    WarnerMedia's subscription revenue consisted of subscriber-based revenue from HBO networks (both linear and legacy streaming on-demand offerings) and the HBO Max streaming platform.

30.    "Linear" offerings through HBO networks refer to regularly scheduled programming through cable subscriptions.

31.    HBO's networks (including Cinemax) are available in the U.S. and internationally to subscribers through traditional cable and digital distributors on a premium pay basis.

32.    HBO Max launched in the U.S. in May 2020.  The HBO Max platform is made available by WarnerMedia on a subscription basis through the internet directly to consumers.

33.    Prior to the Merger, Discovery was a global media company that provided content across multiple distribution platforms, including linear platforms such as pay-television, free-to-air and broadcast television, content licensing arrangements, and direct-to-consumer subscription

products, including discovery+.  Discovery provided original and purchased content and live events to approximately 3.7 billion cumulative subscribers and viewers worldwide through networks that it wholly or partially owned.

34.     Discovery's content spans genres including survival, natural history, exploration, sports, general entertainment, home, food, travel, heroes, adventure, crime and investigation, health, and kids.  Discovery's global portfolio of networks includes prominent nonfiction television brands such as Discovery Channel, HGTV, Food Network, TLC, Animal Planet, Investigation Discovery, Travel Channel, Science, and MotorTrend.

35.     In January 2021, Discovery launched discovery+ in the U.S. across several streaming platforms.  Discovery+ is Discovery's internet streaming service.

36.     Discovery invests in content for its networks and brands with the objective of building viewership, optimizing distribution revenue, capturing advertising revenue, and creating or repositioning branded channels and business to sustain long-term growth.

37.     On May 17, 2021, prior to the opening of trading on the U.S. securities markets, AT&T and Discovery issued a joint press release announcing a definitive agreement to combine WarnerMedia's "premium entertainment, sports and news assets with Discovery's leading nonfiction and international entertainment and sports businesses to create a premier, standalone global entertainment company."

38.     In the lead up to the Merger, AT&T transferred its WarnerMedia business to Spinco, which was a newly formed, wholly owned subsidiary of AT&T organized specifically for the purpose of effecting the separation of the WarnerMedia business from AT&T.  In exchange therefor, as contemplated by and required of the Merger, AT&T distributed all of the issued and outstanding shares of Spinco common stock to AT&T stockholders on a *pro rata* basis.

39.     Under the terms of the agreement for the Merger, AT&T was to receive $43 billion from Discovery (subject to adjustment at closing) "in a combination of cash, debt securities and WarnerMedia's retention of certain debt."    AT&T's shareholders were to receive stock representing 71% of the new company (WBD) formed by the Merger of Spinco (which had acquired the WarnerMedia business from AT&T) and Discovery (based on a .241917 exchange ratio for each share of AT&T common stock outstanding).    Specifically, as a result of the Merger, the shares of Spinco common stock that AT&T stockholders received (in consideration for the separation of the WarnerMedia business from AT&T) were automatically converted into the right to receive shares of WBD common stock registered pursuant to the Registration Statement.

40.     Discovery common and preferred shareholders were to own 29% of the new company.  Each Discovery common shareholder was to receive one share of WBD common stock (based on a one-to-one exchange ratio for each share of Discovery common stock owned).

41.     The new company was subsequently named "Warner Bros. Discovery, Inc."

42.     AT&T would continue as a separate publicly owned corporation dedicated primarily to its remaining broadband connectivity operations.

43.     The May 17, 2021 press release announcing the proposed Merger stated, among other things, that the "companies expect the transaction will create substantial value for AT&T and Discovery shareholders" by, among other things, (i) "[a]ccelerating both companies' plans for leading direct-to-consumer (DTC) streaming services for global consumers," (ii) "[f]orming a new company that will have significant scale and investment resources with projected 2023 Revenue of approximately $52 billion, adjusted EBITDA of approximately $14 billion, and an industry leading Free Cash Flow conversion rate of approximately 60%," and (iii) "[c]reating at least $3 billion in expected cost synergies annually for the new company to increase its investment in content and digital innovation...."

44.     The press release further stated that the transaction would allow the combined entity to "scale its global DTC business" and emphasized the "tremendous DTC potential" of the "strengthened combined assets," stating that it would create "a stronger competitor in global streaming":

> The new company will compete globally in the fast-growing direct-to-consumer business — bringing compelling content to DTC subscribers across its portfolio, including HBO Max and the recently launched discovery+. The transaction will combine WarnerMedia's storied content library of popular and valuable IP with Discovery's global footprint, trove of local-language content and deep regional expertise across more than 200 countries and territories. The new company will be able to invest in more original content for its streaming services, enhance the programming options across its global linear pay TV and broadcast channels, and offer more innovative video experiences and consumer choices.

* * *

> The new company will be able to increase investment and capabilities in original content and programming . . . .

45.     Then-Discovery President and CEO Zaslav was identified in the press release as "lead[ing] the proposed new company."

46.     John Stankey, AT&T's CEO, was quoted in the press release as emphasizing that the transaction will "create efficiencies which can be re-invested in producing great content" and as being motivated to position "the new company to be one of the leading global direct-to-customer streaming platforms."

47.     Zaslav added in the press release that the combination would yield "a globally scaled growth company committed to a strong balance sheet that is better positioned to compete with the world's largest streamers."

48.     The press release emphasized that the "new company expects to . . . utilize the significant cash flow of the combined company to rapidly de-lever to approximately 3.0x within 24 months[.]"

49.     The deal was conditioned on the approval by a vote of the majority of Discovery voting stockholders, and customary closing conditions, including the receipt of regulatory approvals.  No vote was required of AT&T shareholders.

50.     Accompanying the press release was a PowerPoint that emphasized the "Financial Highlights" of the Merger, including that the transaction had "[s]ignificant synergies with $3+ billion of expected run-rate cost savings" and that "[r]obust FCF supports deleveraging, reinvestment and financial flexibility."

51.     The May 17, 2021 press release and accompanying PowerPoint were filed on May 17, 2021 by Discovery as an exhibit to a Form 8-K.  The May 17, 2021 Form 8-K was incorporated by reference in the Prospectus.

52.     On May 17, 2021, shortly after the issuance of the press release, the two companies convened a joint conference call with investors to discuss the proposed Merger.  The May 17, 2021 conference call transcript was filed by Discovery with the SEC pursuant to Rule 425 under the Securities Act and deemed filed under Rule 14a-12 under the Securities Exchange Act of 1934.

53.     On the call, Zaslav again emphasized the significance of the respective companies' streaming platforms as motivating the transaction:

> With greater financial flexibility, strong free cash flow and global growth that positions this new company to invest even more content . . . . The transaction we're announcing today creates an extraordinary entertainment company that accelerates and assures our place as a fully scaled and differentiated global streaming platform powered by the opportunity to maximize value of our estimated $20 billion a year in content spent . . . . Direct to consumer momentum on both sides will accelerate our ability to be one of the top streaming companies in the world.

54.     Zaslav also stated that Discovery "intend[s] to fund significantly the direct to consumer piece of [CNN] . . . . [P]eople want to get their news on every . . . device."

55.     Zaslav added that "we'll start with a little over $55 billion in debt.  But, this company is going to be a free cash flow machine . . . . [W]e will have over $15 billion in direct to

consumer, but over $8 billion in free cash flow.  So, you'll see that leverage . . . come down very quickly . . . . We're starting with $20 billion [annual investment in content] and we want to invest in more. $20 billion is what we spend now together . . . and it's a very efficient model, I think about 60%.  You see we got $14 billion in EBIT in '23, and we're expecting more than $8 billion in free cash flow."

56.     On November 18, 2021, Discovery filed with the SEC its initial Registration Statement and Joint Proxy Statement/Prospectus for the upcoming transaction, which contained projections for both Discovery and WarnerMedia.  Discovery's 2023 Adjusted EBITDA projection (pre-stock based compensation) was $4.1 billion and WarnerMedia's EBITDA projection was $6.9 billion.

57.     Over the next approximate three months, Discovery filed amended versions of that document until the Amendment No. 3 to Form S-4 Registration Statement and definitive Joint Proxy Statement//Prospectus was filed on February 4, 2022.  The amended Registration Statement was signed by Zaslav and Wiedenfels.

58.     The 2023 adjusted EBITDA projections were left unchanged.

59.     The Registration Statement was declared effective by the SEC on February 10, 2022 and the final Joint Proxy Statement/Prospectus was filed with the SEC that same day.

60.     The Registration Statement registered WBD common stock that was issued to AT&T stockholders via the automatic conversion of their Spinco common stock into the right to receive shares of WBD common stock, as well as the shares of WBD common stock that were issued upon the reclassification and conversion of Discovery capital stock existing immediately prior to the Merger into shares of WBD common stock.

**Defendants' Materially False and Misleading Statements and Omissions in the Prospectus
and Discovery's February 24, 2022 Conference Call**

61.    The Prospectus stated that "Discovery expects WBD to realize cost synergies of
over $3.0 billion on a run-rate basis by the end of the second full year after the completion of the
Transactions."   "These cost synergies are expected to be driven by technology, marketing and
platform efficiencies."  These cost savings, according to the Prospectus, would "enable[e] WBD
to increase its investment in content and digital innovation and enhance its competitiveness in the
global DTC business."

62.    The Prospectus emphasized that the transaction was motivated to exploit the direct-
to-market streaming business and focused on the synergies between WarnerMedia and Discovery
in that market:

> The combination of Discovery's and the WarnerMedia Business's robust portfolios
> of entertainment, kids, news and sports content is expected to position WBD as a
> stronger global competitor in streaming and digital entertainment with favorable
> prospects in the global DTC [direct to consumer] race, and improve the overall
> growth profile for WBD in the future. The Transactions bring together the
> complementary brands of Discovery and the WarnerMedia Business to the benefit
> of consumers. The Transactions will combine the WarnerMedia Business's storied
> content library of popular and valuable intellectual property with Discovery's
> global footprint, trove of local-language content and deep regional expertise across
> more than 220 countries and territories. Discovery expects this broad, worldwide
> portfolio of brands, coupled with its DTC potential and the attractiveness of the
> combined assets, to result in increased market penetration globally.
>
> * * *
>
> *Creates A Stronger Global Competitor in Streaming and Digital Entertainment*.
> The combination of Discovery's and the WarnerMedia Business's robust portfolios
> of entertainment, kids, news and sports content is expected to position WBD as a
> stronger global competitor in streaming and digital entertainment with favorable
> prospects in the global DTC race, and improve the overall growth profile for WBD
> in the future.
>
> * * *
>
> *Global DTC Opportunities*. The combination of Discovery and the WarnerMedia
> Business ***will*** create a viable competitor to the largest streaming services by

combining the strong, complementary intellectual property portfolios, deep content offerings and high-quality content-creation capabilities of both companies.

Following the Transactions, WBD and its streaming products, HBO Max and discovery+, *will* have diverse, high-quality content valued by consumers and a global reach with established presence and brand appeal in key markets. Discovery expects WBD to be better able to compete globally in the fast-growing DTC landscape against the global streaming leaders, including Netflix, Amazon Prime Video and Disney+.

(Emphases in bold and italics added.)

63.     The Prospectus stated that as of September 30, 2021, discovery+ had "20 million total paying DTC subscribers," and that "[s]ubscribers are only counted if they are on a paying status[.]"  Discovery+'s subscription numbers included subscribers through Verizon, "which is offering access to discovery+ for up to 12 months to certain of its customers."

64.     The Prospectus also stated that as of September 30, 2021, "the WarnerMedia Business had approximately 69.4 million HBO MAX/HBO subscribers globally."  The footnotes to that disclosure stated that domestic HBO MAX and HBO subscribers include "subscribers receiving access through bundled services with affiliates that may not have signed in," and international subscribers, "including wholesale subscribers that may not have signed in."

65.     The Registration Statement did not state the number of HBO Max or HBO "subscribers," included within the 69.4 million aggregate subscribers disclosed in the Prospectus, "that may not have signed in" or whether those subscribers in fact had not signed in.

66.     The Prospectus also disclosed information concerning "Adjusted EBITDA" [earnings before interest taxes depreciation and amortization].  The Prospectus stated what was included and what was excluded within the definition of Adjusted EBITDA and that Discovery "believes Adjusted EBITDA helps identify underlying trends and facilitate evaluation of period-to-period operating performance by eliminating items that are variable in nature and not considered

by Discovery management in the evaluation of ongoing operating performance, allowing comparison of recurring core business operating results over multiple periods."

67.    On February 24, 2022, Discovery issued a press release announcing its fourth quarter and full year 2021 results.

68.    On February 24, 2022, shortly after the issuance of the February 24, 2022 press release, Discovery held a conference call with investors.

69.    Defendant Zaslav assured investors on the conference call that "[u]pon closing, [WBD] will stand on incredibly solid footing creatively and financially.  This is a real company and we expect to deliver meaningful free cash flow over the near and long term . . . . As a company, when we come together, we will stand on firm footing, look to benefit from both a very balanced business model and from the costs synergy tailwinds we expect to result from a merger.  Supporting our expected reduction in gross leverage to 3x or below within two years, starting from 4.5x lower net debt to EBITDA when we [start] up the new company."

70.    Zaslav also stated on the call that "[w]e [apparently referring to Discovery] have a very low churn product in the U.S., our churn is getting better in Europe as we've made [the service] broader."

71.    On the call Zaslav also referenced "CNN, the premier global news network with real resources and news gathering services all over the world."

72.    Defendant Wiedenfels added on the conference call that he remained "very confident with our projected net leverage at closing of 4.5x or better and reiterate that our long-term target leverage range for [WBD] remains 2.5x to 3x, which we intend to achieve within 24 months from close and possibly sooner."

73.    Wiedenfels also stated that Discovery and WarnerMedia had "recently conducted some high-level meetings across our respective companies."

74.     On the earnings call, an analyst asked whether Discovery still had confidence in the

2023 adjusted EBITDA and free cash flow projections of $14 billion and $8 billion, respectively.

Wiedenfels reassured investors that Discovery had "done some more work" and "everything we've

learned so far has, if anything, given me more confidence on our ability to generate these numbers."

Wiedenfels emphasized that Discovery had "full confidence in the guidance that we gave when we

announced this deal":

> [Y]es, full confidence in the guidance that we gave when we announced this deal.
> Again as you know, we're in an approval process here. So, we have done some
> more work, but are eager to get into the detailed planning of these synergies after
> closing. But again, everything we've learned so far has, if anything, given me more
> confidence on our ability to generate these numbers.

75.     Later on the call, Wiedenfels added: "[A]ll the work that we get done, again, as I've

said in my earlier response here if anything, [we've] gotten more excited about the opportunity.

We've had first very high-level meetings with the WarnerMedia side as well, that are going very

well."

76.     In terms of investment in content, Wiedenfels stated that Discovery had "taken a

conservative approach" with its cash flow analyses and had "put in a very significant room for

increases" in spending.

77.     Zaslav added in response to that same question that "we're going to be generating

$8 billion or more in free cash flow.  So we have plenty of money to spend.  That already assumes

that we're going to spend more money on content."  Zaslav also stated: "[W]e're quite confident

in the numbers that we've given you."

78.     Wiedenfels added with respect to the $3 billion of anticipated synergies:

> [W]e're running two completely separate direct-to-consumer technology stacks of
> marketing operations and we're spending roughly $6 billion for technology and
> marketing between HBO Max and Discovery Plus. Clearly, once we have
> successfully migrated those technology stacks into one, there is going to be
> tremendous opportunity to reduce costs.

79.     The transcript of the February 24, 2022 conference call was submitted by WBD in a filing with the SEC:

> [Filed] pursuant to Rule 425 under the Securities Act of 1933 and deemed filed under Rule 14a-12 under the Securities Exchange Act of 1934.

80.     As subsequent events demonstrated, at the time of the February 24, 2022 conference call, either Discovery and the Individual Defendants did not have access to meaningful information concerning WarnerMedia's business transactions, and therefore were negligent in confirming financial information, or alternatively, Discovery and the Individual Defendants did have access to meaningful information concerning WarnerMedia's business transactions, and therefore were negligent in confirming financial information.

81.     The statements made by Defendants in the Registration Statement and Prospectus (¶¶ 61-66), and on the February 24, 2022 conference call (¶¶ 69-78), were untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading because, among other things, they misrepresented and omitted material adverse facts with respect to WarnerMedia.

82.     Among the material adverse facts Defendants expressed to WBD shareholders *after* the closing of the Merger, but were known by or knowable to Defendants at the time the statements in ¶¶ 61-66 and 69-78 above were made, were that: (i) WarnerMedia's HBO Max streaming business had an unacceptable churn rate that made the business not "viable" unless reversed (¶¶ 95, 109); (ii) WarnerMedia was overinvesting in entertainment content for streaming, without sufficient concern for return on investment (¶¶ 94, 108, 110); (iii) WarnerMedia had a business model to grow the number of subscribers to its streaming service without regard to cost or profitability (¶¶ 107-08, 110); (iv) WarnerMedia was improvidently concentrating its investments in streaming and ignoring its other business lines (¶¶ 107-08, 110); and (v) WarnerMedia had

overstated the number of subscribers to HBO Max by as many as 10 million subscribers, by including as subscribers AT&T customers who had received bundled access to HBO Max, but had not signed onto the service (¶¶ 100-02).

83. The Defendants purported in the Prospectus to have done significant due diligence and to have great familiarity with the operations of WarnerMedia prior to filing the Prospectus with the SEC. Investors expected no less, given the substantial investment that Discovery was making in the Merger. Moreover, Defendants stated on the February 24, 2022 conference call that they were continuing to have high level communications with WarnerMedia management and were confident in the continuing truth of the information previously disclosed to investors. The adverse information disclosed to WBD shareholders after the closing of the Merger was information fundamental to WarnerMedia's operations that either was known to Defendants or should have been known to Defendants if their statements with respect to due diligence, familiarity with WarnerMedia's operations, and continuing high level communications with WarnerMedia management were true.

## Discovery Shareholders Approve the Merger

84. On March 11, 2022 Discovery shareholders as of the January 18, 2022 record date, without knowledge of the foregoing facts, overwhelmingly voted to approve the Merger. The Merger subsequently closed on April 8, 2022, and WBD began trading on the NASDAQ on April 11, 2022.

85. Discovery shares closed on April 8, 2022, the last trading day as a public company, at $24.43.

86. Effective April 11, 2022, approximately 169.5 million shares of Discovery Series A common stock (DISCA), 6.5 million shares of Discovery Series B common stock (DISCB), and

330.1 million shares of Discovery Series C common stock (DISCK) were converted into one share each of WBD common stock.

87.     WBD common stock closed on April 11, 2022, its first day as a public company, at $24.78.

**The Truth Begins to Emerge**

88.     On April 21, 2022, prior to the opening of the NASDAQ, AT&T issued a press release reporting its first quarter 2022 results (reflecting WarnerMedia's operations for the quarter) disclosing that WarnerMedia's operating income had fallen 32.7% year over year to $1.3 billion. AT&T also disclosed on a conference call transcribed and made available by Bloomberg that free cash flow had declined $2.6 billion year-over-year and attributed the decline to "$1.2 billion in lower year-over-year securitization of receivables in advance of the transaction, $600 million in higher cash content spend, increased investments in HBO Max global footprint and wrap up with the CNN+ launch as well as NHL right payments and other working capital changes."

89.     On April 21, 2022, it was reported during trading hours by a variety of news services that new WBD management was shutting down CNN+ after it was started up a month earlier. According to published reports, including the *Washington Post*, CNN+ had drawn modest subscription sign-ups and faced uncertain long-term prospects.

90.     AT&T's earnings release and the sudden news concerning CNN+ caused WBD shares to decline on April 21, 2022 by $1.56 per share, or 6.8%, from $23.01 to $21.45 per share.

91.     On April 26, 2022, prior to the opening of the securities markets, WBD issued a press release and held an investor conference call reporting its first quarter 2022 operating results. The conference call was transcribed and made available on Bloomberg.

92.     Inasmuch as the Merger had only closed on April 8, 2022, the first quarter results only reported Discovery's operations as a stand-alone company.

93.    However, in the conference call following issuance of the press release, also conducted prior to the opening of securities markets, senior WBD management expressed their disappointment with WarnerMedia's first quarter operating results of "more than $40 billion of revenue and really virtually no free cash flow."  "[T]he operating results . . . were down in WarnerMedia's first quarter, 33% decline versus prior year to $1.3 billion.  Free cash flow declined even more, declining by $2.6 billion versus prior year and more importantly significantly negative in absolute terms."  Defendant Wiedenfels stated on the call that WarnerMedia's "Q1 operating profit and cash flow . . . were clearly below my expectations.  And given that Q1 performance and previously unplanned projects in sight, I currently estimate the WarnerMedia part of our profit baseline for 2022 will be around $500 million lower than what I had anticipated."

94.    Wiedenfels added WBD was in the process of rectifying "certain [WarnerMedia] investment initiatives underway in plain sight that I don't think have attractive enough return profiles . . . . I feel very confident in our ability to rectify some of the drivers behind the business case deviations and some very quickly, with the CNN+ decision last week being Exhibit A."  Wiedenfels repeated that "CNN+ is just one example, and I don't want to go through sort of a list of specific examples, but there's a lot of chunky investments that are lacking what I would view as a solid analytical financial foundation and meeting the ROI hurdles that I would like to see for major investments. 2022 very much looks a little messier than probably what I had hoped for."

95.    Wiedenfels surprised investors on the April 26, 2022 call by saying: "There is meaningful churn on HBO Max, much higher than the churn that we have seen."

96.    Zaslav also added on the April 26, 2022 call that "a lot of synergy potential is really going to come from cost avoidance and elimination of planned expenses for the streaming business."

97.    Thus, Zaslav revealed that the "synergies" that had been promised through terminating duplicative operations (primarily administration and marketing), that would enable WBD to invest in more content, were going to be achieved through reducing content, such as the cancellation of CNN+.

98.    On April 26, 2022, the price of WBD common stock fell by $1.67 per share, or 7.8%, from a closing price of $21.50 per share on April 25, 2022 to close at $19.83 per share on April 26, 2022.

99.    Then, on August 4, 2022, after the close of the U.S. securities markets, WBD issued a press release and held an investor conference call announcing its second quarter 2022 operating results.  The conference call was transcribed and made available on Bloomberg.

100.    The press release revealed that WBD had adjusted its "DTC subscriber definition," and that the new definition "resulted in the exclusion of 10 million legacy Discovery non-core subscribers" and "unactivated AT&T mobility subscribers from the Q1 subscriber count."

101.    The footnotes to the press release set forth the new DTC subscriber definition:

(i) a retail subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue, whether directly or through a third party, from a direct-to-consumer platform; (ii) a wholesale subscription to discovery+, HBO, or HBO Max for which we have recognized subscription revenue from a fixed-fee arrangement with a third party and where the individual user has activated their subscription; and (iii) a wholesale subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue on a per subscriber basis.

102.    JB Perrette ("Perrette"), the CEO and President of WBD's Global Streaming and Games division, added on the subsequent conference call with respect to the subscriber numbers that the "goal is to provide you with a clear and transparent number of true paying subscribers to our core service" (recognizing that the prior disclosures were neither "clear" nor "transparent").

103.    During the earnings call, Wiedenfels said WBD was lowering its full year 2022 adjusted EBITDA guidance from the $10.6 billion shown in the Prospectus to $9.0 - $9.5 billion.

104.    He went on to say "we have also now had an opportunity to fully assess legacy Warner financials post-closing.  Having concluded this process, we determined that certain Legacy WarnerMedia budget projections that were made available to us prior to closing vary from what we now view as legacy WarnerMedia's budget baseline post-closing. I'm taking a deep dive and pressure testing what we found.  Our assessment has resulted in lower EBITDA projections."

105.    Accordingly, WBD reduced its projections for 2023 adjusted EBITDA to $12 billion.

106.    WBD also revised downward its projection that it would convert 60% of EBITDA to free cash flow and stated only that it anticipated converting 25-50% of EBITDA to free cash flow by 2023.

107.    Perrette, in his prepared remarks, criticized the strategy that had been followed by WarnerMedia and other streaming companies prior to the Merger of "collapsing all windows into streaming, overpaying for and overinvesting in content and offering it all at the same time for a low price":

> [I]n recent years, a strategy has emerged that suggests the video business will be better off collapsing all windows into streaming, overpaying for and overinvesting in content and offering it all at the same time for a low price. We don't believe in this strategy.

108.    Other statements on the August 4, 2022 conference call were harshly critical of WarnerMedia, whereas Defendants' earlier statements had been unabashedly laudatory.  For example, Perrette stated that "we will shift away from heavily discounted promotions that were part of the gross [subscriber] adds focused strategy over the past to a more balanced approach that optimizes revenue as well as subscribers"; Wiedenfels stated that "we are taking a thoughtful approach on how we intend to scale our D2C business, smartly and methodically" and "that's just one component of a more balanced distribution strategy versus one that seeks to drive subscriber

growth at any cost"); and Zaslav stated "this idea of expensive films going direct-to-streaming, we cannot find an economic case for it" and "[w]e can't find an economic value for it".

109.    Perrette also stated on the August 4, 2022 call, concerning the churn at HBO Max, that WBD's "number one thing for a successful streaming service . . . was to get churn down," and that "putting all the content together [HBO Max and discovery+] was really the only option ['to get the churn down'] . . . to make this a viable business":

> [T]he #1 thing in our view for a successful streaming service as a business is to get churn down and to have a low churn number. At the end of the day, having great . . . appointment viewing series, the challenge is people come in and then they go out, if there's nothing else. And ultimately, the breadth of the offering matters to get the churn down so that there's something for everyone in the household, everyone in the family. And we've seen it across all our data points where the more people you have in a household, using the service, the stickier it is, the lower your churn is the more viable our businesses. And so at the end of the day, ***putting all the content together was really the only option we saw to making this a viable business***.

(Emphasis added.)

110.    Zaslav was also surprisingly critical of WarnerMedia's business model inasmuch as he had committed $43 billion and 71% of the Discovery business to acquire a 29% interest in WarnerMedia:

> [Viewers are] willing to spend a lot of money domestically and outside the U.S., not as much, but they're willing to pay. It was a decision to say, "why have them pay a lot. Let's just collapse everything in and spend, spend, spend and then charge very little." And I think that was supported by this idea like clicks in the '90s that subs were going to be great currency. And so we're going to be very sensible. We're about free cash flow. We've got the best library, we think, and the highest quality content. We think we could build a great business -- streaming business to touch everyone. But we're not collapsing businesses on it. And I think sensibility will be that there'll be a lot of people that are willing to pay a lot more for the quality that we have.

111.    However, Zaslav was unable to explain how he would get subscribers to pay more for WBD's streaming services in an increasingly competitive market or why if he had such a dim view of WarnerMedia's business model (to "spend, spend, spend, and then charge very little") he had not disclosed those true facts in the Prospectus or on the February 24, 2022 conference call.

112.    On August 5, 2022, the first trading day after release of WBD's second quarter results, and the August 4, 2022 conference call, WBD's common stock fell by $2.89 per share, or 16.5%, from $17.48 per share to $14.59 per share.

113.    WBD common shares have fallen by $12.99, or 52.4%, from $24.78 per share on April 11, 2022, to $11.79 on September 23, 2022.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who: (1) exchanged Discovery common stock for WBD common stock pursuant or traceable to the Registration Statement and Prospectus; (2) acquired WBD common stock pursuant or traceable to the Registration Statement and Prospectus, including shareholders of AT&T and/or Spinco who acquired WBD common stock as a result of the Merger; or (3) purchased shares of WBD common stock on the open market traceable to the Prospectus through the date of the filing of this Complaint.  This class action is also brought on behalf of a subset of the Section 11 Class consisting solely of former Discovery shareholders who exchanged their Discovery common shares for WBD common shares pursuant to the Prospectus.  Excluded from the Class are the Defendants herein, the Excluded D&Os, members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

115.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of people in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by WBD or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct as complained of herein.

117.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

118.    Common questions of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law or fact common to the Class are:

- Whether Defendants violated the Securities Act as alleged herein;

- Whether statements made by Defendants to the investing public in the Prospectus misrepresented or omitted material facts about the financial condition, business, operations, and management of WBD; and

- Whether the Class members have sustained damages and, if so, the proper measure of damages.

119.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members is impracticable.  Moreover, since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

121.    This Count is asserted against all Defendants for violations of Section 11 of the Securities Act (15 U.S.C. § 77k), on behalf of the Class.

122.    The May 17, 2021 press release and Prospectus contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, as described in detail above.

123.    As the issuer of the registered securities, WBD is strictly liable for the untrue statements of material fact and material omissions contained in the May 17, 2021 press release and Prospectus.

124.    The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf, and are therefore liable for the untrue statements of material fact or material omissions contained in the Prospectus and the failure of the Prospectus to be complete and accurate.

125.    Defendants issued, caused to be issued, and participated in the issuance of untrue statements of material fact or made material omissions to the investing public in the Prospectus. As a result of Defendants' wrongful conduct, the market price for WBD common stock was artificially inflated, and Plaintiffs and members of the Class suffered damages in connection with: (i) the exchange of Discovery common stock for WBD common stock; (ii) the acquisition of WBD common stock pursuant or traceable to the Registration Statement and Prospectus, including through the ownership or holding of AT&T and/or Spinco common stock; and/or (iii) the purchase of WBD common stock on the open market.

126.    Plaintiffs and members of the Class acquired WBD common stock pursuant to or traceable to the Prospectus, and, at the time of their acquisitions, were without knowledge of the wrongful conduct alleged herein.

127.    This claim has been brought within one year of the discovery of the untrue statements and omissions and within three years of the date of the Merger.

128.    As a result of the foregoing, Defendants are liable for violations of Section 11 of the Securities Act.

129.    The Plaintiffs and members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### (Violations of Section 12(a)(2) of the Securities Act Against All Defendants)

130.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131.    This Count is asserted against all Defendants, on behalf of the Section 12(a)(2) Subclass and is based on Section 12(a)(2) of the Securities Act (15 U.S.C. § 77l).

132.    Each of the Individual Defendants were active participants in encouraging class members to exchange their Discovery common shares for WBD common shares.

133.    The February 24, 2022 conference call included untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, as alleged above.

134.    By means of the Prospectus and February 24, 2022 conference call, Discovery, WBD, and the Individual Defendants promoted, offered, or sold common stock and used means or instruments of communication in interstate commerce to promote, offer, or sell common stock.

135.     Defendants are therefore liable under Section 12(a)(2) for the misrepresentations and omissions contained in the foregoing documents and oral communications.

136.     At the time of their purchases, the Plaintiffs and members of the Class did not know, nor in the exercise of due diligence could have known, of the material misstatements and omissions in the foregoing documents and oral communications.

137.     The Plaintiffs and other members of the Class who exchanged WBD stock pursuant to the Prospectus sustained substantial damages as a direct and proximate result of Defendants' violations of Section 12(a)(2).

138.     Accordingly, members of the Class who hold common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, or to recover rescissory or other damages to the maximum extent permitted by law, and hereby tender (to the extent tender is required) their shares.  Class members who have sold their common stock seek damages to the maximum extent permitted by law.

139.     This claim has been brought within one year of the discovery of the untrue statements and omissions and within three years of the date of the Merger.

## COUNT III

### (Violations of Section 15 of the Securities Act Against the Individual Defendants)

140.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.     This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act (15 U.S.C. § 77o), on behalf of the Plaintiffs and the other Section 11 Class members, as well as the Section 12(a)(2) Subclass members.

142.     As set forth in Counts I and II, Discovery and WBD are liable pursuant to Sections 11 and 12(a)(2) of the Securities Act.

143.    At all relevant times, the Individual Defendants were controlling persons of Discovery and WBD within the meaning of Section 15 of the Securities Act.  The Individual Defendants served as executive officers and (with respect to Defendant Zaslav) as a Director of Discovery and WBD prior to and at the time of the Merger.

144.    Each of the Individual Defendants was a participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the Merger to be completed.

145.    The Individual Defendants, by virtue of their positions as senior officers and (with respect to Defendant Zaslav) as a Director of the Company, controlled Discovery and WBD, as well as the content of the Prospectus and the February 24, 2022 conference call.  The Individual Defendants had the power and influence and exercised the same to cause Discovery and WBD to engage in the acts described herein.

146.    As a direct and proximate result of Discovery's and WBD's and the Individual Defendants' wrongful conduct, the market price for WBD common stock was artificially inflated, and Plaintiffs and members of the Class suffered damages in connection with the exchange of Discovery common stock for WBD common stock; the acquisition of WBD common stock pursuant or traceable to the Registration Statement and Prospectus, including through the ownership or holding of AT&T and/or Spinco common stock; and/or the purchase of WBD common stock on the open market..

147.    This action was brought within one year of the discovery of the untruthfulness of the statements and omissions and within three years of the shareholder vote.

148.    As a result of the foregoing, the Individual Defendants are liable under Section 15 of the Securities Act as control persons for the violations of Sections 11 and 12(a)(2).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest, as allowed by law;

C.      Awarding rescissory damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest, as allowed by law;

D.      Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  October 24, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ J. Alexander Hood II*
J. Alexander Hood II
Jeremy A. Lieberman
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
jalieberman@pomlaw.com
jlopiano@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.    I, __Tome & Violeta Todorovski_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Discovery, Inc. ("Discovery") and Warner

Bros. Discovery, Inc. ("Warner Bros." or the "Company") and authorize the filing of a comparable

complaint on my behalf.

3.    I did not purchase or acquire Warner Bros. securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange

Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Warner Bros. securities during the Class, including providing

testimony at deposition and trial, if necessary.  I understand that the Court has the authority to

select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Warner Bros. securities during the

Class as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


**Executed** <u>10/11/2022</u>
                 **(Date)**

                                    *Tome Todorovski*
                                    *Violeta Todorovski*
                                    _____
                                         **(Signature)**
                                    Tome Todorovski
                                    Violeta Todorovski
                                    _____
                                    **(Type or Print Name)**

**Warner Bros. Discovery, Inc. f/k/a Discovery, Inc. (Merger Action) (WBD)**     **Tome and Violeta Todorovski**

**List of Purchases and Sales**

| Transaction Type | | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Account 1 | | | | |
| Received* | WBD | 4/11/2022 | 75 | $24.7800 |
| Purchase | WBD | 7/7/2022 | 497 | $14.5900 |
| | | | | |
| Account 2 | | | | |
| Received* | WBD | 4/11/2022 | 624 | $24.7800 |
| Purchase | WBD | 5/9/2022 | 1,460 | $17.0000 |
| Purchase | WBD | 6/9/2022 | 13 | $16.2397 |
| Purchase | WBD | 6/24/2022 | 51 | $14.3491 |
| Purchase | WBD | 7/15/2022 | 11 | $13.9272 |
| Purchase | WBD | 8/1/2022 | 73 | $15.5299 |
| Purchase | WBD | 9/7/2022 | 7 | $12.7493 |
| Purchase | WBD | 9/8/2022 | 10 | $12.5672 |

*Shares received from merger, using 4/11/2022's closing price.